678 A.2d 1073

KEJOO AHN, INDIVIDUALLY, AND HO AHN, BY HIS GUARDIAN, KEJOO AHN, AND KEJOO AHN, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF HO AHN, DECEASED, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT, v. DR. CHUNG KIM, STANLEY BIRCH, ELLSWORTH RAND, "JOHN DOE" AND "JANE ROE", (FICTITIOUS NAMES), DEFENDANTS, AND THE CARRIER FOUNDATION AND THE CARRIER CLINIC MEDICAL ASSOCIATION, DEFENDANTS-RESPONDENTS, AND DR. BOHDAN CEHELYK, FELICIA SCHILP, R.N., MARY MANUELL, R.N., IRWIN KELLY AND BARBARA HIGGINS, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.

Argued February 27, 1996—Decided July 18, 1996.

424

*Michael D. Schottland* argued the cause for appellant and cross-respondent (*Schottland, Aaron & Manning,* attorneys).

*Richard E. Brennan* argued the cause for respondent and cross-appellant Dr. Bohdan Cehelyk (*Shanley & Fisher,* attorneys).

*Leonard Rosenstein* argued the cause for respondents The Carrier Foundation and The Carrier Clinic Medical Association and respondents and cross-appellants Felicia Schilp, R.N., and Mary Manuell, R.N. (*Hurley & Vasios,* attorneys).

*Stephen O. Mortenson* argued the cause for respondent and cross-appellants Irwin Kelly and Barbara Higgins (*Mortenson and Pomeroy,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

This appeal concerns the liability of a private psychiatric hospital and members of its staff for the disappearance of a patient from an open ward. Plaintiff Kejoo Ahn (Mrs. Ahn), instituted this action individually, as guardian of her husband, Dr. Ho Ahn, and as executrix of his estate. Defendants include the Carrier Foundation, which operates the Carrier Clinic, and numerous individual defendants: Dr. Bohdan Cehelyk; nurses Felicia Schilp and Mary Manuell; security officer Barbara Higgins; and director of security Irwin Kelly. Mrs. Ahn seeks recovery for Dr. Ahn's pain and suffering, his wrongful death, and for her own emotional distress. Two separate proceedings preceded the present action. In one, Mrs. Ahn was appointed the guardian of the person and property of Dr. Ahn. In the second, she obtained a declaration of Dr. Ahn's death pursuant to *N.J.S.A.* 3B:27–6.

Before submission of the case to the jury, the court, after hearing testimony from Mrs. Ahn and her daughter, dismissed the

emotional-distress claims. Subsequently, the jury found that Dr. Cehelyk, Schilp, and Higgins had not been negligent. It found further, however, that Manuell had been "negligent in that she deviated from accepted nursing standards in connection with Dr. Ho Ahn." Additionally, the jury found Carrier Clinic negligent "in that other members of its nursing staff deviated from accepted nursing standards" and "in its security staffing on March 22, 1988." Finally, the jury found that Mrs. Ahn failed to prove that Dr. Ahn committed "suicide within a short space of time after his disappearance from the Carrier Foundation." It concluded that defendants' negligence had not caused Dr. Ahn's death. Accordingly, the Law Division entered a judgment for defendants.

The Appellate Division affirmed the dismissal of Mrs. Ahn's emotional-distress claim. Because of erroneous jury instructions, it reversed the judgment dismissing her wrongful-death claim and remanded the matter for retrial as to all defendants. 281 *N.J.Super.* 511, 658 *A.*2d 1286 (1995). Finally, the Appellate Division ruled that Mrs. Ahn could not introduce into evidence the declaration of Dr. Ahn's death or rely on the presumption of his death.

We granted Mrs. Ahn's petition for certification to review the judgment dismissing her emotional-distress claim and restricting the use of the declaration of Dr. Ahn's death. 142 *N.J.* 519, 665 *A.*2d 1111 (1995). We also granted defendants' cross-petitions seeking review of the scope of the remand. *Id.* Dr. Cehelyk, Schilp, and Higgins contend that the Appellate Division should not have reversed the jury finding that they had not been negligent. Kelly essentially argues that the trial court correctly dismissed the claim against him for lack of expert testimony. Manuell basically asserts that the trial court should not have submitted to the jury the issue of her negligence, which was supported by only an improper "net opinion."

We affirm the dismissal of Mrs. Ahn's claim for emotional distress and the remand for a retrial on negligence, causation, and damages as to all defendants, except Dr. Cehelyk, as to whom plaintiff has elected not to proceed any further. We modify the

Appellate Division judgment regarding use of the presumption and declaration of death and remand the matter to the Law Division.

I.

Dr. Ahn was admitted voluntarily to the Carrier Clinic on March 22, 1988, for severe depression. A forty-three-year old anesthesiologist, he and Mrs. Ahn had two children: a thirteen-year old son and an eleven-year old daughter. Dr. Ahn disappeared from the Clinic within six hours of his admission.

Mrs. Ahn testified that beginning in 1987 Dr. Ahn "worried a lot," and felt "hopeless" and "useless." Dr. Ahn, who had settled a malpractice action that year, thought he was "a bad doctor." Also, he was distressed about an Internal Revenue Service investigation and the prospect that the Government would take his home and other property.

In January, 1988, a psychiatrist, Dr. C.N. Kim, began treating Dr. Ahn. On the first visit, Dr. Ahn attempted suicide by trying to hang himself in the bathroom with his belt. Dr. Kim placed Dr. Ahn on medication and told Mrs. Ahn to "watch him carefully."

Thereafter, Dr. Ahn stopped working, felt helpless, and did not eat or sleep. He returned to work in March, 1988. A few weeks later, one of his patients died, and Dr. Ahn's depression deepened. After meeting with Dr. Lee, a family friend, Dr. Ahn agreed that he needed in-patient treatment. Dr. Lee arranged for Dr. Ahn's admission to Carrier.

On March 22, 1988, at about 10:00 a.m., Mrs. Ahn drove Dr. Ahn to the Carrier Clinic. The Clinic is located in a rural area of Montgomery Township on 400 acres of open grounds approximately one mile from Route 206 and a few miles from Princeton Airport. Surrounding the grounds are a sparsely-populated residential area, fields, and woodlands. Rising to the west are the Sourland Mountains.

On arrival at the Clinic, Dr. and Mrs. Ahn signed the admission forms and met with the admitting physician, Dr. Cehelyk. In the admission report, Dr. Cehelyk noted that Dr. Ahn had a history of depression while in medical school. Dr. Ahn, however, was well until October, 1987, when he became "progressively more depressed." Dr. Cehelyk diagnosed Dr. Ahn with "major effective disorder depressed," noting specifically high anxiety level with agitation; guilty and pessimistic ruminations; profound psychomotor retardation (a slowing down and slow thinking); indigenous depressive symptoms (poor sleep habits, mood variations, and poor appetite); and suicidal ideations (thoughts of hurting oneself). Believing that Dr. Ahn had suicidal ideations, but was not suicidal, Dr. Cehelyk did not assign Dr. Ahn to a closed unit, where his movements would be restricted. Instead, Dr. Cehelyk assigned him to an open unit, where patients have various dining and grounds privileges ranging from freedom to move in public areas, such as the dining room and gym, to unsupervised walks of the grounds.

The nurse in charge of the unit, Carolyn Barter, wrote in her nursing admission progress note that Dr. Ahn was "quite depressed," "never smiled during interview," and had suicidal thoughts. Dr. Ahn told her, however, that he would hurt himself only at home, and not in the hospital.

After their interview with Dr. Cehelyk, Dr. and Mrs. Ahn went to Dr. Ahn's room. A guard checked Dr. Ahn's belongings and removed his razor, but not his belt. Mrs. Ahn left Carrier Clinic at approximately 1 p.m..

On returning home to Toms River, Mrs. Ahn, who was still worried about her husband, called Dr. C.N. Kim. He told her that he would call the Clinic.

At 3 p.m., Manuell replaced Barter as the nurse in charge of the unit. Manuell last saw Dr. Ahn around 4 p.m. His roommate saw him at 5 p.m. Since then, no one has seen or heard from him.

At approximately 5:30 p.m., after receiving a call from Dr. C.N. Kim, Dr. Chung Kim went to meet with Dr. Ahn. Dr. Kim could not find him. When Dr. Ahn did not respond to pages on the intercom, nursing assistants tried to find him.

Although Manuell heard the pages, she testified that she learned of Dr. Ahn's disappearance when she returned from dinner at 8 p.m. She called her supervisor, Schilp, who instructed Manuell to conduct a search of the other units. Clinic personnel completed the search in twenty minutes.

Manuell announced over the PA system a "stat head check," a room-to-room verification of all patients. She also notified Higgins who, with Ellsworth Rand, were the only security officers on duty. A third officer should have been on duty but was absent. Higgins went on a "search and rescue," which consists of a forty-five minute search in a vehicle of the grounds and surrounding roadways. While conducting the search, Higgins received a radio message that "patient Ho Ahn was suicidal."

According to Mrs. Ahn, between 8:00 and 8:45 p.m., she called Carrier. A nurse informed her, "Your husband is not with us." Carrier claims, however, that an unidentified staff member had called Mrs. Ahn to inform her of Dr. Ahn's disappearance.

Schilp notified Dr. Kull, Director of Admissions, at 8:45 p.m. that Dr. Ahn was missing. Shortly thereafter, Schilp notified the Montgomery Township police. By then, Higgins realized that the situation was "severe," because "the patient was suicidal."

Higgins informed Carrier's director of security, Irwin Kelly, at 9:15 p.m. of Dr. Ahn's disappearance. Although Kelly came to the Clinic, Higgins remained in charge of the search, which continued with road searches by nursing assistants until 11 p.m. Police continued to search in cars and with one dog until 12:30 a.m. Carrier personnel conducted a three hour "mountain search" the following day. The police and Mrs. Ahn's private investigator also continued to search unsuccessfully with dogs and helicopters during the ensuing week.

## II.

On August 26, 1988, Mrs. Ahn was appointed guardian of the person and property of Dr. Ahn. One year after his disappearance, on March 22, 1989, Mrs. Ahn filed a complaint in the present action originally seeking recovery for Dr. Ahn's pain and suffering and her own emotional distress. In a separate proceeding in March of 1993, the Law Division declared Dr. Ahn legally dead as of March 23, 1993, five years after his disappearance. The Surrogate of Ocean County then appointed Mrs. Ahn the executrix of Dr. Ahn's estate. Consequently, Mrs. Ahn amended her complaint to include a cause of action for the wrongful death of Dr. Ahn. The trial court denied her motion to add nurse Carolyn Barter as a defendant.

In dismissing Mrs. Ahn's claim for emotional distress, the court explained that although Mrs. Ahn doubtless had been shocked to learn of her husband's disappearance, her shock was like that of a wife who learns that her husband has died due to medical negligence. Further, the fact that Dr. Ahn was missing, instead of conclusively dead, did not distinguish her case from one involving ordinary medical malpractice, for which a spouse generally may not recover for emotional distress.

At the close of Mrs. Ahn's case, the court granted directed verdicts for Kelly and Rand. Although Kelly had scheduled three officers for that evening, nothing indicated he knew that only two had reported. Rand, the court explained, had merely followed Higgins's instructions.

Over the objection of Mrs. Ahn's counsel, the court instructed the jury "not to presume that Doctor Ahn committed suicide." It explained that Mrs. Ahn bore the burden of proving by a preponderance of evidence that Dr. Ahn had committed suicide. It also charged the jury that a court order had been entered declaring Dr. Ahn dead. The issue, therefore, was not whether Dr. Ahn was dead, but whether he had committed suicide shortly after leaving the Clinic.

In addition to its other findings, the jury found that Dr. Ahn had not committed "suicide within a short space of time after his disappearance from the Carrier Foundation." Consequently, the court entered a judgment for all defendants.

The Appellate Division found reversible error in the charge on the presumption against suicide. It reasoned that the charge was particularly damaging because Mrs. Ahn bore the burden of proving that defendants' negligence had caused Dr. Ahn's death. The court explained "that the erroneous jury instruction on the presumption against suicide irremediably tainted the jury's special verdicts, on both the negligence and causation of wrongful death issues, because the concept of suicide was such an integral part of this unusual trial proceeding." 281 *N.J.Super.* at 534, 658 *A.*2d 1286. According to the court, the jury's evaluation of the standards of psychiatric care "involved the claimed or denied risks of suicide in this particular case relevant to the issue of negligence on the admission procedure, the security of the patient within the hospital, and the search procedures used when he eloped." *Ibid.* The court explained that "[t]he presumption against Dr. Ahn's suicide should not have been on the evidentiary scales with all the other evidence for or against a suicidal death." *Id.* at 535, 658 *A.*2d 1286.

The Appellate Division also determined that the trial judge erred in limiting Mrs. Ahn to a theory of intentional, active suicide. It concluded that "if plaintiff wants to pursue a broader theory than suicide or intentional self-destruction on retrial, she may do so." *Id.* at 536, 658 *A.*2d 1286. For Mrs. Ahn to succeed, the jury "must find that Dr. Ahn met his death by suicide, or misadventure, or accident or exposure within a reasonable period of time after leaving Carrier, a period of time which would relate his demise to a negligent breach of duty by one or more of the defendants." *Ibid.*

Finally, the Appellate Division precluded Mrs. Ahn from referring at trial to the previously-entered declaration of Dr. Ahn's death. The court reasoned that the order pertained to "winding

up his affairs," *id.* at 537, 658 *A.*2d 1286, and "did not establish anything pertinent factually to the wrongful death action, especially since neither party has sought to effectively invoke collateral estoppel or issue preclusion in this case." *Ibid.* Further, the court stated that, as with the presumption against suicide, counsel should not refer at trial to the statutory presumption of death. *Ibid.* Thus, the Appellate Division concluded:

[R]eference to the statutory presumption of death [and to the declaration of death] is no more appropriate on the retrial than reference to the presumption against suicide was. They are both procedural vehicles forged by the law to expedite human affairs where the true facts are uncertain. In this case each has demonstrated its utility. Plaintiff has been qualified after five years to bring the death action and has been forced to come forward with factual proof on the likelihood that Dr. Ahn committed suicide. She has had the advantage of the presumption of death statute. She has assumed the procedural burden of proving a suicide. Counsel cannot comment on and the judge cannot charge on the presumptions.

The force and utility of both presumptions is dissipated and they are now irrelevant to the jury. The case should be presented as a straight-forward wrongful death action with the issues of negligence and causation presented to the jury without the clutter or distraction of these legal presumptions.

[*Ibid.*]

On the other issues, the Appellate Division affirmed the dismissal of Mrs. Ahn's claim for emotional distress. *Id.* at 532, 658 *A.*2d 1286. It permitted her to add Barter as a defendant to the wrongful death action. *Id.* at 531, 658 *A.*2d 1286. Finally, the court reversed the summary judgment in favor of Kelly, asserting that reasonable minds could differ about whether Kelly had been negligent. *Id.* Thus, the court ordered a retrial on both the wrongful death and survival actions as to Carrier Foundation, Dr. Cehelyk, Manuell, Schilp, Higgins, and Kelly. *Id.* at 534, 658 *A.*2d 1286.

## III.

Both Mrs. Ahn and defendants question the terms of the remand. Mrs. Ahn argues that the erroneous charge on the presumption against suicide was unrelated to the jury's finding that Manuell and the Carrier nursing staff had been negligent.

She concedes that her argument leads to the preservation of the findings that Dr. Cehelyk and Schilp were not negligent in their professional medical capacities, but contends that Schilp should remain liable for breach of her security-related duties arising from the initial search of the units, the stat check, and the search and rescue. Although Mrs. Ahn acknowledges that Barter was not a defendant in the first trial, she contends that the jury, by finding the Carrier nursing staff negligent, implicitly found Barter negligent. In sum, Mrs. Ahn urges a retrial on causation and damages, but not negligence, as to Manuell and the Carrier nursing and security staffs, and a retrial on all issues as to Kelly, Higgins, and Schilp.

Dr. Cehelyk, Schilp, and Higgins rely on the jury findings that each was not negligent. They contend that those findings are unrelated to the erroneous instruction on causation. Manuell contends that we should dismiss the claims against her because the evidence of her negligence was insufficient to merit submission of that issue to the jury. Finally, Kelly contends that we should sustain the trial court's directed verdict in his favor.

IV.

We agree substantially with the Appellate Division's ruling that the issues of negligence and causation are so interrelated that both issues must be retried. 281 *N.J.Super.* at 534–35, 658 *A.*2d 1286. That ruling comports with the general rule that issues in negligence cases should be retried together unless the issue unaffected by error is entirely distinct and separable from the other issues. *See Beggs v. Pasalano*, 14 *N.J.Super.* 549, 552, 82 *A.*2d 640 (App.Div.1951); *see also Gasoline Products v. Champlin Refining Co.*, 283 *U.S.* 494, 500, 51 *S.Ct.* 513, 515, 75 *L. Ed.* 1188 (1931) (articulating comparable federal standard on partial retrials). The ruling comports also with the proposition that negligence and causation generally intertwine. *Conklin v. Hannoch Weisman*, 145 *N.J.* 395, 410, 678 *A.*2d 1060 (1996). Whether issues are sufficiently separable to warrant a partial retrial ulti-

mately depends on the circumstances of each case. *See Ragusa v. Lau*, 233 *N.J.Super.* 84, 90, 558 *A.*2d 38 (App.Div.1989), *rev'd on other grounds*, 119 *N.J.* 276, 575 *A.*2d 8 (1990). Here, the risk that the patient would commit suicide interrelates with the alleged negligence in such matters as the hospital's admission procedures, custodial care, and search. *See Kassick v. Milwaukee Elec. Tool Corp.*, 120 *N.J.* 130, 136, 576 *A.*2d 270 (1990) (ordering new trial on product defects, misuse of product, and proximate cause because issues were interrelated). For example, the jury finding that members of the Carrier nursing staff "deviated from accepted nursing standards" does not indicate whether the deviation related to the staff's duties pertaining to nursing or security. Without knowing the basis for the finding, a second jury could not determine whether the deviation caused the patient's death. In these circumstances, the more just and reasonable result is to require a retrial on both negligence and causation.

The jury returned a verdict that Dr. Cehelyk had not been negligent, but the Appellate Division included him in the remand for retrial. 281 *N.J.Super.* at 534, 658 *A.*2d 1286. Dr. Cehelyk petitioned for reinstatement of the judgment in his favor. At oral argument, Mrs. Ahn's counsel informed us that she does not wish to pursue the claim against Dr. Cehelyk. Under the circumstances, we modify the judgment of the Appellate Division and reinstate the judgment of dismissal in Dr. Cehelyk's favor.

## V.

We likewise affirm the dismissal of Mrs. Ahn's claim for negligent infliction of emotional distress. *Id.* at 532, 658 *A.*2d 1286. She concedes that her claim does not satisfy the requirements for recognized causes of action, specifically those involving bystanders to accidents, *Portee v. Jaffee*, 84 *N.J.* 88, 417 *A.*2d 521 (1980); actions for medical malpractice committed in the presence of the plaintiff, *Frame v. Kothari*, 115 *N.J.* 638, 560 *A.*2d 675 (1989); *Strachan v. John F. Kennedy Memorial Hospital*, 109

*N.J.* 523, 538 *A.2d* 346 (1988); or cases involving loss of a corpse, *Muniz v. United Hospitals Medical Center Presbyterian Hospital,* 153 *N.J.Super.* 79, 379 *A.2d* 57 (App.Div.1977). Instead, she seeks the recognition of a previously unrecognized claim arising out of her participation in her husband's pre-admission psychiatric treatment and in his admission to the Clinic.

■ She claims both a direct injury to herself, *see Carey v. Lovett,* 132 *N.J.* 44, 55, 622 *A.2d* 1279 (1993), and an indirect injury arising out of the negligent treatment of her husband. The indirect claim derives from the line of cases involving bystanders. *Frame, supra,* 115 *N.J.* at 644–49, 560 *A.2d* 675; *Portee, supra,* 84 *N.J.* at 101, 417 *A.2d* 521. Generally, to recover for emotional distress resulting from medical malpractice on a family member, a claimant must establish a close temporal connection between the malpractice and the injury to the patient as well as the contemporaneous observation of the injury by the claimant. *Frame, supra,* 115 *N.J.* at 645–46, 560 *A.2d* 675. In effect, the claimant must witness the malpractice and immediately connect it to the injury. *Gendek v. Poblete,* 139 *N.J.* 291, 300, 654 *A.2d* 970 (1995). The injury generally must be "susceptible to immediate sensory perception, and the claimant must observe the victim at the time of or immediately after the injury." *Frame, supra,* 115 *N.J.* at 644, 560 *A.2d* 675; *see also, Carey, supra,* 132 *N.J.* at 58, 622 *A.2d* 1279.

Last term, we rejected a couple's emotional-distress claim based on nursing and medical malpractice on their new-born son who died after several days of complicated and painful medical treatment. *Gendek, supra,* 139 *N.J.* at 301–02, 654 *A.2d* 970. Neither parent witnessed any act of malpractice. Furthermore, neither immediately connected any malpractice with their baby's respiratory failure or the need for emergency procedures. *Id.* at 302, 654 *A.2d* 970. Notwithstanding the genuineness of their suffering, their claim did not manifest the "high degree of involvement and connection," necessary to sustain a claim for the indirect infliction of emotional distress. *Ibid.*

Similarly, although Mrs. Ahn doubtless has suffered from the loss of her husband and the ambiguity that clouds his disappearance, she cannot sustain a claim for indirect infliction of emotional distress. She did not witness either the alleged negligence of the Carrier staff or the death or disappearance of her husband. *Portee, supra,* 84 *N.J.* at 101, 417 *A.*2d 521; *see also Lindenmuth v. Alperin,* 197 *N.J.Super.* 385, 389, 484 *A.*2d 1316 (Law Div.1984) (finding that misdiagnosis of infant who died three days later was not event causing injury which is capable of sensory perception). Furthermore, she did not immediately associate the loss of her husband with any negligent conduct by Carrier staff. *See Gendek, supra,* 139 *N.J.* at 300, 654 *A.*2d 970; *Frame, supra,* 115 *N.J.* at 643–44, 560 *A.*2d 675. As shocked as she may have been to learn over the telephone that Dr. Ahn was missing, that shock does not support a cause of action. *See Acevedo v. County of Essex,* 207 *N.J.Super.* 579, 585, 504 *A.*2d 813 (Law Div.1985). We cannot distinguish her reaction from that of other spouses who sustain the loss of a husband or wife.

We likewise conclude that defendants did not owe a direct duty to Mrs. Ahn. Generally, a hospital is not liable to a patient's family members for negligent injury to the patient. *Johnson v. Jamaica Hosp.,* 62 *N.Y.*2d 523, 478 *N.Y.S.*2d 838, 467 *N.E.*2d 502, 504 (1984); *see* Bruce I. McDaniel, Annotation, *Recovery for Mental or Emotional Distress Resulting from Injury to, or Death of, Member of Plaintiff's Family Arising from Physician's or Hospital's Wrongful Conduct,* 77 *A.L.R.*3d 447, 485 (1977) (collecting cases and indicating that hospital generally is not liable for emotional distress to member of patient's family).

Consistent with the general rule, we conclude that Carrier did not assume the risk that any tortious conduct toward Dr. Ahn would result in liability for emotional distress to Mrs. Ahn. *Strachan* is distinguishable. There, we recognized the right of parents to recover for their emotional distress due to the hospital's failure to release their son's corpse after he was brain dead. 109 *N.J.* at 535, 538 *A.*2d 346. Similarly, in *Muniz,* the Appellate Division

recognized the right of parents to recover for infliction of emotional distress when a hospital failed to confirm the death of their baby and misplaced the corpse for three weeks. 153 *N.J.Super.* at 81, 379 *A.*2d 57. Here, nothing indicates that Dr. Ahn died before his disappearance. As stressful as the uncertainty about Dr. Ahn's disappearance may be for Mrs. Ahn, we agree with the lower courts that Carrier's duty to him does not extend to her.

## VI.

■ The final issue concerns the effect in a wrongful-death action of a declaration of death under *N.J.S.A.* 3B:27–6 which provides:

The Superior Court may declare the absentee dead, if it is satisfied that he should be presumed dead under the provisions of N.J.S.A. 3B:27–1, or if it concludes from a review of the evidence, both direct and circumstantial, that the earlier death of the absentee has been established and that the death occurred prior to the institution of the proceeding before the court. A declaration with respect to a nonresident shall affect only property located within the State.

*N.J.S.A.* 3B:27–1 provides:

A resident or nonresident of this State who absents himself from the place of his last known residence for a continuous period of 5 years, during which he has not been heard from, and whose absence is not satisfactorily explained after diligent search, or inquiry is presumed to be dead. His death is presumed to have occurred at the end of the period unless there is sufficient evidence for determining that death occurred earlier.

Pursuant to those statutes, Mrs. Ahn obtained on March 23, 1993, an "order of declaration of death of Ho Ahn." It provided that Dr. Ahn "is hereby declared dead as of March 23, 1993," and that Mrs. Ahn's "request to have [Dr.] Ahn's date of death made retroactive to March 23, 1988, is hereby denied." The Appellate Division ruled that Mrs. Ahn may not rely on the statutory presumption of death or refer to the Chancery Division's order to prove any element of her cause of action, including Dr. Ahn's death. We disagree.

■ A brief summary of the effect of presumptions will aid comprehension of the statute. Simply stated, a presumption requires the fact-finder, once it finds the existence of one fact, to

presume the existence of another fact. If the opposing party introduces evidence "tending to disprove" the presumed fact, the presumption disappears. *N.J.R.E.* 301; *see Ford Motor Co. v. Township of Edison*, 127 *N.J.* 290, 312, 604 *A.*2d 580 (1992). The question of the proof of the presumed fact becomes one for the fact-finder "unless reasonable persons would not differ as to the existence or non-existence of the presumed fact." *N.J.R.E.* 301.

 Assuming that the party seeking the benefit of the presumption bears the burden of proof, one effect of a presumption is to shift to the opposing party the burden of production, but not the burden of proof. As *N.J.R.E.* 301 states, "[t]he burden of persuasion as to the proof or disproof of the presumed fact does not shift to the party against whom the presumption is directed unless otherwise required by law." *See also Ford Motor Co.*, *supra*, 127 *N.J.* at 314–15, 604 *A.*2d 580 (stating that burden of persuasion remains on plaintiff throughout case); *Facendo v. S.M.S. Concast, Inc.*, 286 *N.J.Super.* 575, 585, 670 *A.*2d 44 (App. Div.1996) (same).

Thus, a plaintiff, such as Mrs. Ahn, who bears the burden of proving the death of her husband, on introducing into evidence a declaration under *N.J.S.A.* 3B:27–1 of her husband's death, would be entitled to a presumption that he is in fact dead. The burden of production would then shift to defendants to introduce evidence rebutting the presumption. Notwithstanding that shift in the burden of production, the ultimate burden of proving Dr. Ahn's death would remain on Mrs. Ahn.

Declarations of death are used routinely in connection with such matters as remarriage, the administration of decedents' estates, the payment of life insurance, and the sale of real estate. Reliance by third parties on the statutory presumption in such matters suggests that reliance is appropriate also in a wrongful death action. Common sense, fundamental fairness, and the need to bring stability to human affairs also support that suggestion. The alternative would consign the widow to limbo and unduly complicate, if not forestall, an action for her husband's wrongful death.

Although the declaration of death by itself suffices to create the presumption of Dr. Ahn's death, Mrs. Ahn may also introduce other evidence to support the presumption.

If defendants introduce sufficient evidence to rebut the presumption, the jury may consider the declaration of death and the underlying evidence in determining whether Dr. Ahn is dead. That evidence would include Dr. Ahn's medical history, past suicide attempt, family history of suicide, mental condition on admission to Carrier, diagnosis on admission, the facts surrounding his subsequent disappearance, and the nature of the Carrier Clinic as a psychiatric hospital. The jury would then weigh all the evidence and decide whether Mrs. Ahn has met her burden of proving Dr. Ahn's death. If, however, defendants fail to introduce sufficient evidence to rebut the presumption, the court should instruct the jury that if it accepts the order declaring Dr. Ahn dead, then it must also find that he is dead in fact. *See Apfelbaum v. Prudential Ins. Co. of America*, 12 *N.J. Misc.* 62, 65, 169 *A.* 677 (1933) (stating that the issue is one for the jury); *Midgett v. United States*, 221 *Ct.Cl.* 171, 603 *F.*2d 835, 846 (1979) (stating that presumption of death amounts to prima facie case, and if not rebutted, requires "a verdict for plaintiff on the issue of death"); *see also* Alfred C. Clapp & Dorothy G. Black, 7A New Jersey Practice § 1854, at 513–14 & n. 4 (1984) (stating "It would seem that where a certified copy of the judgment is introduced into evidence and is not met with countervailing proof, the court should direct a verdict as to the issue.").

To assist the court and parties on remand, we add our conclusion that the evidence defendants introduced at trial was insufficient to rebut the presumption. That evidence includes the facts that Dr. Ahn's glasses and coat were missing, the failure to find his body, and the proximity of the Clinic to Route 206 and the Princeton Airport. Unless defendants can adduce additional evidence to disprove Dr. Ahn's death, Mrs. Ahn is entitled to the presumption that he is in fact dead. In reaching these conclusions, we note that Mrs. Ahn has not pled or sought to introduce

proof in support of the doctrines of res judicata, collateral estoppel, or issue preclusion. Hence, we do not determine the applicability of those doctrines to her action.

We affirm the judgment of the Appellate Division to the extent that it dismisses Mrs. Ahn's emotional-distress claim and remands the wrongful death and survival actions for retrial. We modify the judgment by dismissing the complaint against Dr. Cehelyk and by according Mrs. Ahn the benefit of the presumption of death.

*For affirmance and modification*— Justices HANDLER, O'HERN, GARIBALDI, STEIN, COLEMAN and POLLOCK—6.

*Opposed*—None.